1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    STEVEN QUINONES,                        No.  2:22-CV-0833-DC-DMC-P

12                    Plaintiff,

13         v.                                 <u>FINDINGS AND RECOMMENDATIONS</u>

14    RICHARD GRAY, et al.,

15                    Defendants.

16

17              Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18    42 U.S.C. § 1983.  Pending before the Court is Defendant Gray's motion for summary judgment.

19    ECF No. 37.  Defendant argues that Plaintiff cannot prevail on the merits of his claims and that

20    Plaintiff failed to exhaust his claims by way of the prison grievance process prior to filing suit.

21    Plaintiff has not filed an opposition.

22              The Federal Rules of Civil Procedure provide for summary judgment or summary

23    adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file,

24    together with affidavits, if any, show that there is no genuine issue as to any material fact and that

25    the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

26    standard for summary judgment and summary adjudication is the same.  <u>See</u> Fed. R. Civ. P.

27    56(a), 56(c); <u>see also</u> <u>Mora v. ChemTronics</u>, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of

28    the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  <u>See</u>

1    <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the

2    moving party

> . . . always bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any," which it believes demonstrate the absence of a
> genuine issue of material fact.
>
> <u>Id.</u>, at 323 (quoting former Fed. R. Civ. P. 56(c)); <u>see also</u> Fed. R. Civ. P.
> 56(c)(1).

8        If the moving party meets its initial responsibility, the burden then shifts to the

9    opposing party to establish that a genuine issue as to any material fact actually does exist.  <u>See</u>

10   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to

11   establish the existence of this factual dispute, the opposing party may not rely upon the

12   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

13   form of affidavits, and/or admissible discovery material, in support of its contention that the

14   dispute exists.  <u>See</u> Fed. R. Civ. P. 56(c)(1); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 n.11.  The

15   opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

16   affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

17   242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th

18   Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

19   return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436

20   (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than

21   simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

22   taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

23   'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).  It is sufficient that "the

24   claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions

25   of the truth at trial."  <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.

26   / / /

27   / / /

28   / / /

2

1    In resolving the summary judgment motion, the court examines the pleadings,

2    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

3    See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson,

4    477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

5    court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

6    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

7    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

8    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

9    1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the

10    judge, not whether there is literally no evidence, but whether there is any upon which a jury could

11    properly proceed to find a verdict for the party producing it, upon whom the onus of proof is

12    imposed." Anderson, 477 U.S. at 251.

13

14    **I. BACKGROUND**

15    A.    **Plaintiff's Allegations**

16    Plaintiff is a prisoner currently housed at High Desert State Prison (HDSP),

17    located in Susanville, California. See ECF No. 1.  Plaintiff brings suit against the following

18    defendants: (1) Robert St. Andre, Warden at HDSP; (2) Dr. Richard Gray, a physician at HDSP;

19    (3) Dr. Robert C. Fox, a physician at HDSP; (4) John Doe I; (5) John Doe II; and (6) the

20    California Department of Corrections and Rehabilitations (CDCR). Id. at 2.  Plaintiff alleges

21    violation of his Eighth Amendment rights against the named defendants for deliberate

22    indifference towards his medical care. Id.

23    Plaintiff alleges that, on May 30, 2019, upon Plaintiff's arrival at HDSP, Plaintiff

24    was assigned the upper level of the bunk bed. Id.  Plaintiff stated to Defendant Doe I that he

25    needed to be placed on the lower level of the bunk bed because he has gout. Id.  Defendant Doe I

26    ordered Plaintiff to take the upper level of the bunk bed, or he would receive a Rule Violation

27    Report. Id.  On the same night, Plaintiff fell off the upper level of the bunk bed, which led to

28    severe injuries. Id.  The following morning, Plaintiff's cell mate reported the fall to Defendant

1    Doe II. <u>Id.</u> at 5.  Plaintiff was moved to the lower level of the bunk bed after the incident. <u>Id.</u>

2           According to Plaintiff, on June 2, 2019, Plaintiff stated that his head was still

3    hurting from the fall and his left eyeball began to secrete blood. <u>Id.</u>  Plaintiff alleges that

4    Defendant Doe I should have listened to his plea for the lower level of the bunk bed, thus, his

5    injuries could have been avoided. <u>Id.</u>  Plaintiff alleges that Defendant Doe I's actions violated his

6    Fourteenth and Eight Amendment Rights because he was denied his right to medical care, due

7    process, and treated with deliberate indifference. <u>Id.</u> at 5.

8           The following day, Defendant Doe II took Plaintiff to the medical clinic. <u>Id.</u>

9    According to Plaintiff, at the medical clinic, Defendant Gray disregarded Plaintiff's request to be

10   seen immediately. <u>Id.</u>  Plaintiff alleges that Defendant Gray sent him away with no medical

11   treatment. <u>Id.</u>  Plaintiff was seen by Defendant Fox the following day. <u>Id.</u>  Plaintiff was

12   diagnosed with injuries to his left heel and abrasions to his lower extremities. <u>Id.</u> at 9.

13   Furthermore, Plaintiff was diagnosed with a ruptured globe full-thickness corneal laceration on

14   his left eye, essentially a ruptured eye. <u>Id.</u>  Plaintiff was prescribed moxifloxacin eye drops,

15   oxycodone, and IV fentanyl. <u>Id.</u>  Plaintiff was also ordered for an x-ray. <u>Id.</u>

16          It was later determined that Plaintiff's left eye was infected and required surgery.

17   <u>Id.</u> at. 6.  Plaintiff alleges that the untimely medical treatment resulted in vision loss of his left

18   eye. <u>Id.</u>  Furthermore, Plaintiff alleges that he did not receive adequate medical care from

19   Defendant Fox because he was unable to be seen regularly as required. <u>Id.</u>  Plaintiff states that

20   his medical appointments have continuously been rescheduled for nearly two years as a result of

21   the COVID-19 pandemic. <u>Id.</u> at 7.  Plaintiff alleges that Defendant Fox knew the seriousness of

22   his injuries and deliberately chose to ignore it. <u>Id.</u> at 6.

23          On June 4, 2021, Plaintiff received a response regarding his health care grievance

24   dated January 22, 2021. <u>Id.</u> at 13.  The response letter stated that Plaintiff has been prescribed

25   lisinopril, allopurinol, and etodolac to mitigate general aches and pain. <u>Id.</u> at 15.  Also, Plaintiff's

26   medical records confirm that he was placed on a care plan and his primary care provider has

27   discussed the care plan with him. <u>Id.</u>  On August 19, Plaintiff received another response

28   regarding his health care grievance. <u>Id.</u> at 16.  The response letter confirmed that Plaintiff's

1  medical records reflect that his Disability Placement Program and his Verification and

2  Comprehensive Accommodation have been updated. Id. at 17.  Records accurately reflect that

3  Plaintiff requires the bottom level of the bunk bed as of January 1, 2021. Id.  Lastly, the response

4  letter states that Plaintiff's vision has been gradually deteriorating and there is vision loss on his

5  left eye due to the ruptured globe. Id.  A referral has been placed to optometry, but Plaintiff's

6  condition did not require an urgent outside referral. Id.

7        **B.**    **Procedural History**

8        On September 21, 2022, the Court issued a screening order finding Plaintiff had

9  stated a cognizable claim against unnamed Defendant Doe I and Defendant Gray. See ECF No.

10  11, pg. 4. In doing so, the Court required Plaintiff to amend his complaint to allege Doe I's true

11  name before service could be ordered on that individual. Id.  To date, Plaintiff has not done so.[1]

12  As to Defendant Gray, the Court found "Plaintiff states a cognizable claim against Defendant

13  Gray for refusal to provide medical treatment the day after Plaintiff's fall and head injury." Id.

14  The Court granted Plaintiff leave to amend in order to cure the identified deficiencies. Id.

15        Plaintiff filed four requests for an extension of time to file an amended complaint.

16  See ECF Nos. 12, 14, 16, and 18. The Court granted each, with the last order granting Plaintiff a

17  thirty-day extension having been issued on February 2, 2023. See ECF Nos. 13, 14, 17, and 19.

18  On April 3, 2023, after Plaintiff did not file an amended complaint within the thirty-day

19  extension, the Court issued findings and recommendations that the case proceed on Plaintiff's

20  Eighth Amendment medical care claim against Defendants Gray and Doe I, to the extent Doe I is

21  properly identified, and dismissing all other defendants and claims. See ECF No. 21. The Court

22  issued an order determining service on Defendant Gray appropriate. Id. Defendant Gray filed his

23  answer on June 12, 2023. See ECF No. 22.

24  / / /

---

25      [1]    Because CDCR is immune from suit under the Eleventh Amendment, see Brooks

26  v. Sulphur Springs Valley Elec. Coop., 951 F.2d 1050, 1053 (9th Cir. 1991); Lucas v. Dep't of
Corr., 66 F.3d 245, 248 (9th Cir. 1995) (per curiam); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.

27  1989); Alabama v. Pugh, 438 U.S. 781, 782 (1978) (per curiam); Hale v. Arizona, 993 F.2d 1387,
1398-99 (9th Cir. 1993) (en banc), the undersigned will recommend dismissal of CDCR as a

28  defendant to this action.

On July 25, 2023, the District Judge issued an order adopting the April 3, 2023, findings and recommendations in full. <u>See</u> ECF No. 35. Defendant Gray timely filed the currently pending motion for summary judgment on July 23, 2024. <u>See</u> ECF No. 37.  Plaintiff has not filed an opposition.

## II.  THE PARTIES' EVIDENCE

Defendant's motion is supported by a Memorandum of Points and Authorities, ECF No. 37, a Statement of Undisputed Facts (SUF), ECF No. 37-1, and the declarations of Defendant Gray, ECF No. 37-2, CDRC Correctional Counselor II and Grievance Coordinator B. Alkire, ECF No. 37-3, California Correctional Health Care Services (CCHCS) Chief of Health Care Correspondence and Appeals Branch S. Gates, ECF No. 37-4, and Deputy Attorney General Audra C. Call, ECF No. 37-5. Defendant also relies on attached exhibits including Plaintiff's two grievances, the Inmate Tracking System report, Institutional and Headquarters Level responses to Plaintiff's grievances, and transcript of Plaintiff's deposition.

In Defendant's Statement of Undisputed Facts, Defendant first outlines general facts related to Defendant Gray's role at HDSP, as follows:

1.    Defendant was the Chief Physician and Surgeon at High Desert State Prison (HDSP) at the time of the matters at issue in Plaintiff's Complaint. (Declaration of Defendant R. Gray in Support of Motion for Summary Judgment (Gray Dec.) at ¶ 2.)

2.    Defendant Gray was not Plaintiff's primary care physician at HDSP. (Gray Dec. at ¶ 3.)

3.    As Chief Physician and Surgeon, Defendant Gray did not regularly provide direct patient care to inmate patients. (Gray Dec. at ¶ 4.)

4.    As Chief Physician and Surgeon, Defendant Gray did not regularly provide direct patient care to inmate patients. (Gray Dec. at ¶ 5; Declaration of Audra C. Call (Call Dec.) at Exhibit A (Pltf. Depo.) at 80:4-7.)

ECF No. 37-1.

/ / /

/ / /

/ / /

6

1     Defendant then outlines the following facts related to Plaintiff's deliberate

2  indifference claim:

3       5.      There was no policy in place during June 2019, or any
        time, that directed medical staff to turn a patient away from the
4       institutional medical clinic if they were experiencing a medical emergency
        and Defendant never implemented such a policy. (Gray Dec. at ¶ 11; Pltf.
5       Depo. at 76:23-78:23.)

6       6.      There was no policy in place during June 2019, or any
        time, that directed medical staff to turn a patient away from the
7       institutional medical clinic if they were visibly injured and Defendant
        never implemented such a policy. (Gray Dec. at ¶ 11; Pltf. Depo. at 76:23-
8       78:23.)

9       7.      Defendant was not present at the institutional clinic on June
        3, 2019, when Plaintiff alleges that he was turned away from the medical
10      clinic. (Gray Dec. at ¶ 8; Pltf. Depo. at 80:4-7.)

11      8.      Defendant was not aware that Plaintiff was at the
        institutional clinic attempting to be seen on June 3, 2019. (Gray Dec. at ¶
12      7; Pltf. Depo. at 80:4-7.)

13      9.      Plaintiff alleges that other, unidentified medical personnel
        turned Plaintiff away from the medical clinic on June 3, 2019, not
14      Defendant. (Pltf. Depo. at 51:21-52:20.)

15      10.     Defendant did not instruct any medical staff or personnel to
        turn Plaintiff away from the institutional medical clinic on June 3, 2019.
16      (Gray Dec. at ¶¶ 9 & 12; Pltf. Depo. at 80:12-25.)

17      11.     Defendant never approved anyone turning away Plaintiff
        from the medical clinic on or about June 3, 2019. (Gray Dec. at ¶ 12; Pltf.
18      Depo. at 80:12-25.)

19      12.     Plaintiff has never met nor spoken to Defendant. (Pltf.
        Depo. at 80:4-7.)
20                          * * *
21
22      19.     As Chief Physician and Surgeon, part of Defendant's job
        duties was to review and respond to inmate healthcare grievances. (Gray
        Dec. at ¶ 13.)
23
24      20.     In this role, Defendant reviewed, and responded to,
        Plaintiff's medical grievance HDSP HC 20000928. (Gray Dec. at ¶ 14;
25      ECF No. 1 at 3, 13-15.)

26      21.     As part of the investigation into HDSP HC 20000928,
        Plaintiff's medical records were reviewed. (Gray Dec. at ¶ 13; ECF No. 1
27      at 13-15; Ex. B to Gates Dec.)

28  ///

                            7

22. With respect to Plaintiff's eye condition, Plaintiff was seen several times by an ophthalmologist who had determined Plaintiff's condition to be stable. (Ex. B to Gates Dec. at 13; Gray Dec. at ¶ 22.)

23. Plaintiff was prescribed medication for his eye condition, had diagnostic tests, and had a pending order to see the ophthalmologist again for a follow up at the time the grievance was reviewed by Defendant. (Ex. B to Gates Dec. at 13; Gray Dec. at ¶¶ 15 & 16.)

24. Plaintiff's appointment with the ophthalmologist had to be rescheduled on a few occasions because of the COVID-19 outbreak. (Gray Dec. at ¶ 20; Ex. B to Gates Dec. at 13.)

25. Particularly in 2020, at the height of the COVID-19 pandemic, in-person medical appointments were limited as much as possible to prevent the spread and to protect both inmates and staff. (Gray Dec. at ¶¶ 17-19.)

26. Non-emergent medical appointments requiring in-person evaluation were postponed pending on the circumstances and the housing conditions in relation to COVID-19 conditions. (Gray Dec. at ¶¶ 17-19.)

27. There was nothing in the medical records that Defendant reviewed which indicated that Plaintiff would be harmed by having his appointments with the ophthalmologist postponed. (Gray Dec. at ¶ 21.)

28. Defendant had no knowledge or understanding that Plaintiff's eye condition was urgent or that Plaintiff would suffer a substantial risk of serious harm if there was a delay in having Plaintiff see an ophthalmologist. (Gray Dec. at ¶¶ 21-22.)

29. Prior to Defendant's review of the appeal, the medical records reflect that the ophthalmologist determined that Plaintiff's eye condition was stable, and the ophthalmologist would set appointments out for months at a time to monitor Plaintiff. (Ex. B. to Gates Dec. at ¶ 13; Gray Dec. at ¶ 21.)

30. With respect to Plaintiff's heel injury, Plaintiff was seen by multiple medical providers, including his primary care physician, specialists, and nurses. (Ex. B. to Gates Dec at ¶ 13; Gray Dec. at ¶ 23.)

31. Plaintiff was also provided diagnostic tests and was prescribed medication to treat the condition. (Ex. B. to Gates Dec at ¶ 13; Gray Dec. at ¶ 23.)

32. An order for a computed tomography had also been entered by Plaintiff's primary care physician who had just recently seen Plaintiff for a medical visit. The appointment for the computed tomography was pending and Plaintiff was to be notified of the appointment when it was scheduled. (Ex. B. to Gates Dec at ¶ 13; Gray Dec. at ¶ 23.)

33. Nothing in Defendant's review of the medical records suggested that Plaintiff was not provided adequate medical care for his heel injury. (Gray Dec. at ¶ 24.)

1

2

34.    Defendant did not have any information that would lead him to determine that Plaintiff was at a substantial risk of serious harm based upon any failure to provide care of his heel injury. (Gray Dec. at ¶ 24.)

3

4

5

35.    Defendant did not see any information in the medical records that indicated that Plaintiff had sought urgent medical care for either his eye or heel injury between June 4, 2019, and January 22, 2021 (when Defendant responded to Plaintiff's medical grievance HDSP HC 20000928.) (Gray Dec. at ¶ 25.)

6

7

36.    Based upon Defendant's review of Plaintiff's medical records, Defendant determined that Plaintiff's care was adequate, and no intervention was required. (Ex B. to Gates Dec. at 14; ECF No. 1 at 3, 13.)

8

ECF No. 37-1.

9

10

Defendant additionally asserts the following undisputed facts related to Plaintiff's failure to exhaust administrative remedies:

11

12

13

14

13.    There was an administrative process for medical grievances at HDSP at the time of the matters at issue in this case. Inmates were able to appeal any departmental decision, action, condition, or policy which they could demonstrate as having an adverse effect upon their health, safety, or welfare. (Declaration of S. Gates in Support of Motion for Summary Judgment (Gates Dec.) at ¶¶ 6-7.)

15

16

17

14.    Plaintiff submitted 602 Grievance Log No. HDSP-B-19-03429 on or about August 23, 2019, which related to issues regarding Plaintiff's fall from his bunk, the injuries he sustained, his classification, and medical treatment he received for his injuries. (Declaration of B. Alkire in Support of Motion for Summary Judgment (Alkire Dec.) at ¶ 10, Exhibit E.)

18

19

20

15.    On August 23, 2019, because the grievance involved medical issues, the grievance was rejected pursuant to Cal. Code. Regs., tit. 15 § 3084.4 and Plaintiff was directed to submit his grievance on the proper 602HC Form and submit the grievance through the medical grievance process. (Alkire Dec. at ¶ 10, Ex. E; ECF No. 1 at 11.)

21

22

16.    Plaintiff submitted his grievance to CCHCS on a 602HC Form on or about November 16, 2020. (Gates Dec. at ¶ 10, Exhibit B; ECF No. 1 at 11.)

23

24

17.    The medical grievance was received by CCHCS on or about November 17, 2020, and was assigned as HDSP HC 20000928. (Gates Dec. at ¶ 10, Ex B.)

25

26

27

18.    Plaintiff did not mention Defendant in HDSP HC 20000928 and did not identify Defendant as having any involvement in Plaintiff being turned away from the institution medical clinic on June 3, 2019 or otherwise being denied medical care. (Gates Dec. at ¶¶ 10 & 13, Ex B; ECF No. 11 at 11-18.)

28

* * *

9

1
2
37.     The institution level response to Plaintiff's grievance HDSP HC 20000928 was issued on January 22, 2021. (Ex B. to Gates Dec. at 12-14; ECF No. 1 at 3, 13.)

3
4
38.     Plaintiff appealed the denial to Headquarters Level of Appeal, and it was also determined at that level that no intervention was needed. (Ex. B to Gates Dec. at ¶ 10, Ex. B at 1-3, 5; ECF No. 1 at 16-18.)

5
6
7
39.     Other than Grievance Log No. HDSP-B-19-03429 and HDSP HC 20000928, Plaintiff did not file any other grievances addressing his injuries suffered in June 2019 or the medical care provided for those injuries. (Gates Dec. at ¶¶ 9 & 13; Alkire Dec. at ¶¶ 11-12; Pltf. Depo. at 95:8-22.)

8
ECF No. 37-1.

9
10
11
While Plaintiff has not filed an opposition or presented any evidence in response to Defendant's motion for summary judgment, the Court will consider Plaintiff's verified complaint as his declaration where appropriate.

12
13
**III. DISUCSSION**

14
15
16
17
18
19
In the pending unopposed motion for summary judgment, Defendant argues that the undisputed facts show that Defendant was not deliberately indifferent to Plaintiff's medical needs.  See ECF No. 37.  Defendant also argues he is entitled to summary judgment because Plaintiff failed to exhaust administrative remedies prior to filing suit.  See id.  For the reasons discussed below, the Court finds both arguments persuasive and will recommend that Defendant's motion for summary judgment be granted.

20
A.     **Exhaustion of Administrative Remedies**

21
22
23
24
25
26
27
28
Prisoners seeking relief under § 1983 must exhaust all available administrative remedies prior to bringing suit.  See 42 U.S.C. § 1997e(a).  This requirement is mandatory regardless of the relief sought.  See Booth v. Churner, 532 U.S. 731, 741 (2001) (overruling Rumbles v. Hill, 182 F.3d 1064 (9th Cir. 1999)).  Because exhaustion must precede the filing of the complaint, compliance with § 1997e(a) is not achieved by exhausting administrative remedies while the lawsuit is pending.  See McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002).  The Supreme Court addressed the exhaustion requirement in Jones v. Bock, 549 U.S. 199 (2007), and held: (1) prisoners are not required to specially plead or demonstrate exhaustion in the complaint

10

1  because lack of exhaustion is an affirmative defense which must be pleaded and proved by the

2  defendants; (2) an individual named as a defendant does not necessarily need to be named in the

3  grievance process for exhaustion to be considered adequate because the applicable procedural

4  rules that a prisoner must follow are defined by the particular grievance process, not by the Prison

5  Litigation Reform Act (PLRA); and (3) the PLRA does not require dismissal of the entire

6  complaint if only some, but not all, claims are unexhausted.  The defendant bears burden of

7  showing non-exhaustion in the first instance.  See Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir.

8  2014).  If met, the plaintiff bears the burden of showing that the grievance process was not

9  available, for example because it was thwarted, prolonged, or inadequate.  See id.

10         The Supreme Court held in Woodford v. Ngo that, in order to exhaust

11  administrative remedies, the prisoner must comply with all of the prison system's procedural

12  rules so that the agency addresses the issues on the merits.   548 U.S. 81, 89-96 (2006).  Thus,

13  exhaustion requires compliance with "deadlines and other critical procedural rules."  Id. at 90.

14  Partial compliance is not enough.  See id.  Substantively, the prisoner must submit a grievance

15  which affords prison officials a full and fair opportunity to address the prisoner's claims.  See id.

16  at 90, 93.  The Supreme Court noted that one of the results of proper exhaustion is to reduce the

17  quantity of prisoner suits "because some prisoners are successful in the administrative process,

18  and others are persuaded by the proceedings not to file an action in federal court."  Id. at 94.

19  When reviewing exhaustion under California prison regulations which have since been amended,

20  the Ninth Circuit observed that, substantively, a grievance is sufficient if it "puts the prison on

21  adequate notice of the problem for which the prisoner seeks redress. . . ."  Griffin v. Arpaio, 557

22  F.3d 1117, 1120 (9th Cir. 2009); see also Sapp v. Kimbrell, 623 F.3d 813, 824 (9th Cir. 2010)

23  (reviewing exhaustion under prior California regulations).

24         Until June 1, 2020, California allowed inmates to administratively appeal "any

25  policy, decision, action, condition, or omission by the department or its staff that the inmate or

26  parolee can demonstrate as having a material adverse effect upon his or her health, safety, or

27  welfare." Cal. Code Regs., tit. 15, § 3084.1(a); Munoz v. Cal. Dep't of Corrs., No. CV 18-10264-

28  CJC (KS), 2020 WL 5199517, at *6 (C.D. Cal. July 24, 2020). CDCR used a three-step process

1   for grievances. Id. (describing the former three-step process).

2          CDCR also used the three-step process for health care grievances until September

3   1, 2017. Id. CDCR then adopted a new two-step procedure for health care grievances (which was

4   renumbered to its current section number in 2018). See Cal. Code Regs., tit. 15, § 3999.225–.230;

5   see also Singh v. Nicolas, No. 18-cv-1852, 2019 WL 2142105 at *3 & nn. 1–4 (E.D. Cal. May

6   16, 2019) (discussing the restructured grievance procedure); Garrett v. Finander, 2019 WL

7   7879659, at *2–3 (C.D. Cal. Dec. 5, 2019) (describing the new grievance procedures). The first

8   level of review is the institutional level of review. Cal. Code Regs., tit. 15, § 3999.228(a). The

9   second level of review is the headquarters level of review. Cal. Code Regs., tit. 15, § 3999.230(a).

10  The headquarters level is the final level of health care grievance review. Cal. Code Regs., tit. 15,

11  § 3999.230(h). The headquarters level decision also exhausts administrative remedies. Id.

12         Under the two-step procedure, inmates must submit a health care grievance on a

13  "CDCR 602 HC" form. Cal. Code Regs., tit. 15, § 3999.227(a). First, the inmate must submit the

14  form to the grievance office "where the grievant is housed within 30 calendar days of: (1) the

15  action or decision being grieved, or (2) initial knowledge of the action or decision being grieved."

16  § 3999.227(b). Second, if an inmate is dissatisfied with the institutional level disposition of their

17  grievance, the inmate may appeal to headquarters, the Health Care Correspondence and Appeals

18  Branch. Cal. Code Regs., tit. 15, § 3999.229(a), .230.

19         Defendant argues that, while Plaintiff filed both inmate and healthcare grievances

20  concerning his injuries and medical care,

21             . . .Plaintiff did not name Defendant in either of these grievances
          and did not reference any policies, implemented by Defendant or
22        otherwise, that resulted in Plaintiff being turned away from the
          institutional clinic on or about June 3, 2019. (SUF Nos. 14 & 18.) Because
23        Plaintiff did not identify Defendant or the specific circumstances
          complained of in his Complaint with respect to Defendant, Plaintiff did
24        not comply with the institution's regulations related to filing of
          grievances. Plaintiff did not, therefore, exhaust his administrative
25        remedies as to the complaints in his Complaint and Defendant is, thereby,
          entitled to summary judgment on that basis as well.
26
          ECF No. 37 at 19.
27

28  / / /

12

The Court agrees. The undisputed evidence shows that Plaintiff submitted two grievances while housed at HDSP, one related to his medical care and one related to property. See ECF No. 37-3 at 3. Exhibit D to the Alkire declaration is Plaintiff's grievance history reflecting that Plaintiff in fact submitted two grievances, both submitted on August 20, 2019, while housed at HDSP as follows: (1) 602 Grievance Log No. HDSP-B-19-03429 and (2) 602 Grievance Log No. HDSP-B-19-03499. See ECF No. 37-3 at 6. The HDSP-B-19-03499 grievance, Exhibit F to the Alkire declaration, relates to property, and thus could not have served to exhaust Plaintiff's medical deliberate indifference claim. The HDSP-B-19-03429 grievance, Exhibit E to the Alkire declaration, was rejected pursuant to Cal. Code Regs., tit. 15, § 3084.4 as it involved medical issues and Plaintiff was directed to resubmit his appeal on the appropriate 602HC Form through the medical grievance process. See ECF No. 37-3 at 3. According to the Alkire declaration and Plaintiff's grievance history, Plaintiff did not file any further documents to the Appeals Office related the HDSP-B-19-03429 grievance. See ECF No. 37-3 at 3.

The undisputed evidence shows that Plaintiff in turn submitted two health care grievances while housed at HDSP. See ECF No. 37-4 at 3. Exhibit A to the Gates declaration is Plaintiff's Health Care Appeals and Risk Tracking System appeal/grievance history reflecting that Plaintiff in fact submitted two health care grievances while housed at HDSP as follows: (1) HDSP HC 20000928, received by CCHCS on November 17, 2020, and (2) HDSP HC 21000111, received on January 21, 2021. See ECF No. 37-4 at 7. The HDSP HC 21000111 grievance, Exhibit C to the Gates declaration, relates to how the COVID-19 outbreak was being handled, and thus was not related to and could not have served to exhaust Plaintiff's medical deliberate indifference claim. The HDSP HC 20000928, Exhibit B to the Gates declaration, does in fact relate to Plaintiff's injuries; however, it does not allege that Defendant Gray or "any policy of Defendant Gray was the cause of Plaintiff being turned away from the clinic on the date he claimed to have been turned away." See ECF No. 37-4 at 4. As such, because the Health Care Correspondence and Appeals Branch was not aware of Defendant Gray's involvement in the matter in any way, the HDSP HC 20000928 grievance was not evaluated to include any involvement of Defendant Gray and did not put the prison on notice of Plaintiff's medical

13

1    deliberate indifference claims, as required under the PLRA. See id. Additionally, the Gates

2    declaration confirms that Plaintiff never filed a healthcare grievance naming Defendant Gray. See

3    id.

4            The undisputed evidence also shows that Plaintiff filed an appeal of the

5    institutional level response which was submitted for headquarters' level review See ECF No. 37-4

6    at 7. Exhibit B to the Gates Declaration consists of documents related to the appeal. See ECF No.

7    37-4 at 9-11. This appeal was received by CCHCS on June 9, 2021, and Plaintiff was provided a

8    response of no intervention on August 19, 2021. See ECF No. 37-4 at 7. As Defendant correctly

9    observes, Defendant Gray was not mentioned in this grievance. See id. Thus, as with the health

10    care grievances discussed above, this grievance does not describe how Defendant Gray acted or

11    failed to act to cause injury to Plaintiff. See id. That is, the grievance does not "put[] the prison on

12    adequate notice of the problem for which the prisoner seeks redress. . . ," nor does it give the

13    prison opportunity to address said problem. Griffin v. Arpaio, 557 F.3d at 1120. On this evidence,

14    which is not in dispute, the Court finds that grievance HDSP HC 20000928 failed to exhaust

15    administrative remedies.

16            Because Plaintiff failed to exhaust available administrative remedies regarding his

17    medical deliberate indifference claims against Defendant Gray prior to filing suit, the Court will

18    recommend that Defendant Gray's motion for summary judgment be granted.

19        **B.    Deliberate Indifference to Plaintiff's Medical Needs**

20            Though the Court finds that Defendant is entitled to summary judgment based on

21    Plaintiff's failure to exhaust administrative remedies prior to filing suit, the Court nonetheless

22    addresses Defendant's arguments related to the merits of Plaintiff's Eighth Amendment medical

23    deliberate indifference claims.

24            The treatment a prisoner receives in prison and the conditions under which the

25    prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

26    and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

27    511 U.S. 825, 832 (1994).  The Eighth Amendment ". . .embodies broad and idealistic concepts of

28    dignity, civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102

14

1   (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

2   Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

3   "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy,

4   801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

5   two requirements are met: (1) objectively, the official's act or omission must be so serious such

6   that it results in the denial of the minimal civilized measure of life's necessities; and (2)

7   subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

8   inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

9   official must have a "sufficiently culpable mind."  See id.

10          Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

11  injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105;

12  see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health

13  needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by

14  Sandin v. Conner, 515 U.S. 472 (1995).  An injury or illness is sufficiently serious if the failure to

15  treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and

16  wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled

17  on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see

18  also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness

19  are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)

20  whether the condition significantly impacts the prisoner's daily activities; and (3) whether the

21  condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122,

22  1131-32 (9th Cir. 2000) (en banc).

23          The requirement of deliberate indifference is less stringent in medical needs cases

24  than in other Eighth Amendment contexts because the responsibility to provide inmates with

25  medical care does not generally conflict with competing penological concerns.  See McGuckin,

26  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

27  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

28  1989).  The complete denial of medical attention may constitute deliberate indifference.  See

15

1   Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

2   treatment, or interference with medical treatment, may also constitute deliberate indifference.  See

3   Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate

4   that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

5          Negligence in diagnosing or treating a medical condition does not, however, give

6   rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a

7   difference of opinion between the prisoner and medical providers concerning the appropriate

8   course of treatment does not generally give rise to an Eighth Amendment claim.  See Jackson v.

9   McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).  However, a claim involving alternate courses of

10  treatment may succeed where the plaintiff shows: (1) the chosen course of treatment was

11  medically unacceptable under the circumstances; and (2) the alternative treatment was chosen in

12  conscious disregard of an excessive risk to the prisoner's health.  See Toguchi v. Chung, 391 F.3d

13  1051, 1058 (9th Cir. 2004).

14         As to the merits of Plaintiff's Eighth Amendment medical care claim for deliberate

15  indifference, Defendant contends he is not liable for the injuries Plaintiff sustained as a result of

16  being turned away from the medical clinic because Defendant did not personally deny Plaintiff

17  care, nor did Defendant institute any policy requiring Plaintiff to be turned away. See ECF No.

18  37, pgs. 12-14.

19         A review of the complaint reflects, as Defendant Gray notes, that Plaintiff alleges

20  that it was "under Dr. Grey's policy" that he was seen with barely a glance over at the clinic on

21  June 3, 2019, and told to fill out a health care request form to be seen later. See ECF No. 1 at 5.

22  Furthermore, Plaintiff asserts that "they (medical staff)" sent Plaintiff away with no treatment

23  after he'd explained it was an emergency, and thus constitutes deliberate indifference. See id.

24         Defendant argues:

25         Because Plaintiff has not pleaded, and cannot show, that Defendant
           was directly involved in, or even had knowledge of, Plaintiff being turned
26         away from the clinic by unknown medical personnel, Defendant is entitled
           to summary judgment.
27
                            * * *
28

                              16

1

> Because there is no genuine dispute that there was no unconstitutional policy put in place by Defendant at the time Plaintiff claims he was turned away from the institutional medical clinic on or about June 3, 2019, Defendant is entitled to summary judgment.

2

3

> ECF No. 37 at 13, 14.

4

5        Defendant's arguments are persuasive.  Plaintiff's allegation against Defendant

6   Gray is based on the notion that Defendant Gray supervised other prison staff who in turn denied

7   Plaintiff medical care.  Supervisory personnel are generally not liable under § 1983 for the actions

8   of their employees.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (holding that there is

9   no respondeat superior liability under § 1983).  A supervisor is only liable for the constitutional

10  violations of subordinates if the supervisor participated in or directed the violations.  See id.

11  Supervisory personnel who implement a policy so deficient that the policy itself is a repudiation

12  of constitutional rights and the moving force behind a constitutional violation may be liable even

13  where such personnel do not overtly participate in the offensive act.  See Redman v. Cnty of San

14  Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).  A supervisory defendant may also be

15  liable where he or she knew of constitutional violations but failed to act to prevent them.  See

16  Taylor, 880 F.2d at 1045; see also Starr v. Baca, 633 F.3d 1191, 1209 (9th Cir. 2011).

17       When a defendant holds a supervisory position, the causal link between such

18  defendant and the claimed constitutional violation must be specifically alleged.  See Fayle v.

19  Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir.

20  1978).  Vague and conclusory allegations concerning the involvement of supervisory personnel in

21  civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th

22  Cir. 1982).  "[A] plaintiff must plead that each Government-official defendant, through the

23  official's own individual actions, has violated the constitution."  See Ashcroft v. Iqbal, 556 U.S.

24  662, 676 (2009).

25       Here, the undisputed evidence shows that Defendant Gray was not present at the

26  clinic on the date Plaintiff alleges he was turned away and Defendant Gray had no knowledge that

27  Plaintiff had visited the clinic or been turned away.  See ECF No. 37-1 at 3.  Furthermore,

28  Defendant Gray did not direct anyone to turn Plaintiff away from the clinic.  See id.  As such, these

1    facts show that Defendant Gray neither personally participated in nor directed the turning away of

2    Plaintiff from the clinic on June 3, 2019. The evidence also shows that Plaintiff cannot identify

3    any policy requiring medical staff to turn an inmate in Plaintiff's circumstances away. See ECF

4    No. 37-5 at 9. To the contrary, the evidence shows that Defendant Gray did not promulgate any

5    policy at any time that required or directed medical staff to turn inmates away from the clinic

6    when the inmate was visibly injured or required emergent medical care. See ECF No. 37-1 at 2.

7            Because the undisputed evidence establishes that Plaintiff cannot prove Defendant

8    Gray's personal involvement, either directly or by way of policy promulgation or implementation,

9    Defendant Gray has met his burden of demonstrating that he is entitled to judgment in his favor as

10   a matter of law.  Plaintiff has not presented any evidence which would tend to refute Defendant's

11   evidence, and a review of the allegations in the verified complaint does nothing to bolster his

12   claim or call Defendant's evidence into question.  Thus, the Court finds that Defendant Gray is

13   entitled to judgment in his favor on the merits of Plaintiff's medical deliberate indifference claim.

14           To the extent Plaintiff is claiming that Defendant Gray is liable because an outside

15   ophthalmology appointment had not been scheduled as of the date the complaint was filed in

16   2022, the Court also agrees with Defendant that the undisputed evidence establishes the non-

17   existence of a genuine dispute of material fact.  According to Defendant:

18           Plaintiff has no evidence to support a claim that Defendant was
             deliberately indifferent based upon Plaintiff's claims in 2022 (when the
19           Complaint was filed) that he had yet to have his ophthalmology
             appointment and was still waiting for his heel to be repaired. Plaintiff has
20           no evidence that Defendant was even aware of Plaintiff's medical
             circumstances at any time other than when Defendant reviewed, and
21           responded to, Plaintiff's healthcare grievance in January 2021. In fact,
             although Plaintiff claims in these allegations that Defendant "keeps stating
22           I have appointments scheduled," the only evidence that Plaintiff has of *any*
             communication he had with Defendant is the one letter from Defendant
23           dated January 22, 2021, denying Plaintiff's healthcare grievance HDSP
             HC 20000928 at the institutional level. (SUF Nos. 12, 36 & 39.) In his
24           deposition, Plaintiff admitted that he had never met Defendant and had
             never personally spoken with Defendant. (SUF No. 12.) Thus, Plaintiff
25           cannot support his claim that Defendant "kept" telling Plaintiff he had
             medical appointments scheduled but nothing happened, or otherwise show
26           that Defendant had any knowledge regarding Plaintiff's medical treatment
             at the time this Complaint was filed. And Plaintiff, further, has not offered

27

28   / / /

1   any facts to support that Defendant would have been aware of any serious
2   medical risk to Plaintiff at the time or that Plaintiff was being denied any
    sort of medical care.

3   ECF No. 37 at 17.

4   Defendant's argument is persuasive. Plaintiff has not presented any evidence to

5   support his claim that: "Dr. Grey [sic] keeps stating I have appointments scheduled, yet 2 years

6   later, I am still waiting. This is cruel and unusual punishment, and a deliberate indifference to my

7   health care needs." See ECF No. 1 at 7. To the contrary, the undisputed evidence shows Plaintiff

8   has never met or spoken to Defendant Gray. See ECF No. 37-1 at 3. The undisputed evidence

9   also shows that, other than Grievance Log Nos. HDSP-B-19-03429 and HDSP HC 20000928,

10  Plaintiff never filed any other grievances addressing his injuries suffered in June 2019 or the

11  medical care provided for those injuries. See ECF No. 37-1 at 8. These facts show that Defendant

12  Gray had no reason to continually review Plaintiff's medical records or to continue

13  communicating with Plaintiff. As such, Plaintiff cannot prevail on any the theory that Defendant

14  Gray kept stating Plaintiff had appointments because Plaintiff cannot establish that Defendant

15  Gray acted any further than the denial of Plaintiff's grievance, let alone acted unnecessarily and

16  wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

19

1

## IV. CONCLUSION

2          Based on the foregoing, the undersigned recommends as follows:

3          1.      California Department of Corrections and Rehabilitation be DISMISSED

4  as a defendant to this action.

5          2.      Defendant's unopposed motion for summary judgment, ECF No. 37, be

6  GRANTED.

7          These findings and recommendations are submitted to the United States District

8  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

9  after being served with these findings and recommendations, any party may file written objections

10 with the Court.  Responses to objections shall be filed within 14 days after service of objections.

11 Failure to file objections within the specified time may waive the right to appeal.  See Martinez v.

12 Ylst, 951 F.2d 1153 (9th Cir. 1991).

13

14 Dated:  January 30, 2025

15                                            _____
                                             DENNIS M. COTA
16                                           UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

20